# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

**In re:**

NEAL AMADOR and
ANNA PAGE AMADOR,

**Debtors.**

**Bankruptcy Case No. 05-41882**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

      James C. Meservy, FREDERICKSEN, WILLIAMS & MESERVY, Jerome, Idaho, Attorney for Debtors.

      Jeffrey G. Howe, Office of the U.S. Trustee, Boise, Idaho, Attorney for U.S. Trustee.

## Background

At issue is the United States Trustee's motion to dismiss Neal and Anna Page Amador's ("Debtors") chapter 7 bankruptcy case under 11 U.S.C. § 707(b)[1] for substantial abuse. Docket No. 21. The UST asserts Debtors have the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, and this Court's Local Bankruptcy Rules, Rules 1001.1–9034.1, as promulgated and enacted prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

MEMORANDUM OF DECISION - 1

ability to fund a chapter 13 plan and should therefore not be allowed relief under chapter 7. Debtors contend they can not possibly offer a feasible plan because of their inability to pay the full amount of all claims entitled to priority over the life of a plan as required by § 1322(a)(2). The Court conducted an evidentiary hearing concerning the UST's motion on March 15, 2006, and at its conclusion gave the parties until April 14, 2006 to supplement the record. Having duly considered the evidence and the parties' submissions, Docket Nos. 35, 36, this Memorandum constitutes the Court's findings of fact, conclusions of law, and disposition of the issues. Fed. R. Bankr. P. 7052; 9014.

**Facts**

Debtors have been married for eight years. They live in a house in Twin Falls, along with Mr. Amador's son, age fifteen. The son attends high school and is active in sports. Debtors each have one other child from previous relationships, both of whom are grown and live elsewhere. Ex. C at 4. While Ms. Amador underwent a surgical procedure in 2005, it appears Debtors are in good health.

Debtors filed a voluntary chapter 7 petition on August 19, 2005. In their schedules, Debtors list approximately $62,000 in unsecured priority debts and

$67,000 in unsecured nonpriority debts. Scheds. E, F Docket No. 1; Ex. B.[2] Schedule I disclosed Debtors earn gross monthly income of $5,700 and net income, after deductions, of $2,400; Schedule J showed Debtors have living expenses of $4,990 per month. However, Debtors' statement of financial affairs revealed Debtors' combined gross yearly income for 2003 and 2004 was approximately $100,000 each year. SOFA, Docket No. 1; Ex. B.

Debtors' schedules omitted some important details concerning Debtors' expected yearly income for 2006 and their true net income each month. Debtors both work full-time for Dell Computers and believe that their employment is secure. Currently, Mr. Amador is employed as a training consultant and earns gross yearly income of approximately $57,800 as a base salary. He expects a 1.5% raise for 2006. While he has received significant bonuses in the past, he does not expect to receive one this year. Instead, he expects his 2006 bonus will amount to about 3% of his gross wages. Debtors' most recent bank statement for the period ending February 15, 2006 shows Mr. Amador deposits bi-weekly net earnings of approximately $1,700. Ex. 1, Attach. 1. Extrapolating for the year, this translates

---

[2] To simplify the income and debt figures in this decision, the Court has rounded the amount of the relevant figures.

MEMORANDUM OF DECISION - 3

into monthly net earnings for Mr. Amador of approximately $3,680.[3]

Ms. Amador testified that she expects a dramatic decrease in her income during 2006, because she previously enjoyed significant overtime pay. *See* Ex. 2 of UST Ex. C (reflecting overtime pay of $12,000 for 2005). As a result of budget cuts, Dell has prohibited overtime work in 2006. Ms. Amador is paid hourly, earning gross wages of $16.51 per hour according to her December 30, 2005 pay statement. Ex. 2 of UST Ex. C. With no overtime, Ms. Amador's gross yearly wages total $34,340. Debtors' most recent bank statement discloses that Ms. Amador's current net take home pay on a bi-weekly basis is $1,055.[4] Ex. 1 of Debtors' Ex. 1. This bi-weekly figure results in monthly net income of $2,285. However, the Court will assume Ms. Amador's estimated net monthly take-home pay will likely average about $2,000 per month in the future, considering she testified Debtors' combined monthly net income had averaged, since filing for bankruptcy, $5,700 per month.[5]

---

[3] On a bi-weekly pay schedule, there are 26 pay periods each year. Multiplying $1,700 by 26 results in yearly net income of $44,200. $44,200 divided by 12 results in monthly net income of $3,683.00.

[4] Debtors' bank statements actually show Ms. Amador made bi-weekly deposits of as much as $1,500. However, the Court accepts as true that Ms. Amador will earn, in 2006, close to her base salary.

[5] Based upon Debtors' testimony, the Court accepts the $5,700 figure as representative of Debtors' current monthly net income, and disregards the apparent error on their schedule I indicating $5,700 represented gross income. This figure presumably

Debtors liquidated significant assets prior to filing for bankruptcy. As Dell employees, Debtors received stock options. In 2005, Debtors cashed in their stock options, netting them $5,000. No explanation was given as to where this money went. Debtors' 2005 tax return indicates they will owe approximately $2,600 in income taxes attributable to the income from the stock options. Docket No. 35. Ms. Amador testified that they currently have no stock options to exercise for 2006, and that they do not expect to receive any.

Debtors also withdrew $12,100 from a money market account on June 15, 2005, and used the cash to pay for their son's baseball tournament, sports equipment, new clothing, a new refrigerator, computer monitors, a video camera, and to repay a debt owed to Ms. Amador's mother for a loan for attorney fees, among other expenditures. Ex. C at 30–32; Ex. D (accounting for $11,780 in funds from the money market account). Debtors also recently traveled to Yellowstone for a family vacation over the Christmas holidays at a cost of $800.

At the time of filing their petition, Debtors' other assets included approximately $100 in cash, various exempt household goods and other assets, and

---

still allows Debtors to contribute, from their gross wages, to their retirement plans and participate in Dell's benefit package, as well as pay their income taxes. *See* Ex. 1 and 2, UST Ex. C (showing deductions from gross wages for medical, dental and vision plans, term life insurance, and 401K plans). Debtors' income figure also omits any expected bonuses, stock options, or other increases to wages that may occur in 2006.

MEMORANDUM OF DECISION - 5

two automobiles, one of which was purchased soon after filing for bankruptcy. Scheds. A–D, Docket No. 1; Ex. B. With respect to their automobiles, at the time of filing, they owned a 2005 Ford Ranger truck valued at $18,000 securing a $19,500 debt, and a 2001 Jeep valued at $10,000 that secured a $17,000 debt. Sched. D, Docket No. 1, Ex. B. Since filing for bankruptcy, Debtors have surrendered the Jeep and purchased a used 2001 Hyundai Santa Fe, which lowered their combined monthly car payments from $1,155 to $900 and uses less fuel. Debtors lost their former home, located in Texas, to foreclosure; they rent their current house.

At the time of the hearing, Debtors' obligations totaled approximately $178,000. Of that amount, Debtors owe approximately $66,950 in unsecured, nonpriority credit card debt incurred for personal expenditures. Sched. F, Docket No. 1; Ex. B; Ex. C at 26–31. Debtors' secured debt consists of their automobile loans, which at the time of filing totaled $36,500. Sched. D, Docket No. 1; Ex. B. It is unclear how the purchase of the new car affected Debtors' total secured debt. Debtors' priority debt includes a claim by the State of Texas against Ms. Amador, evidenced by a state court judgment for unpaid child support, for roughly $38,000.[6] Ex. 1. The other $36,000 of priority debt is owed to the

---

[6] Ms. Amador testified she owes between $35,000 and $40,000. The Court will, for the purposes of this decision, estimate that sum at $38,000.

MEMORANDUM OF DECISION - 6

Internal Revenue Service for unpaid income taxes.  Ex. 1.

The following monthly expenses are listed on Schedule J:

| Item | Amount |
|---|---|
| rent | 1,000.00 |
| utilities | 150.00 |
| water/sewer | 75.00 |
| phone | 60.00 |
| cable | 100.00 |
| cell phone | 150.00 |
| internet | 50.00 |
| home maint. | 200.00 |
| food | 1,000.00 |
| clothing | 100.00 |
| laundry | 50.00 |
| med/dental | 50.00 |
| transportation | 500.00 |
| recreation | 100.00 |
| charitable | 50.00 |
| insurance:auto | 200.00 |
| Auto Loans | 1,155.00 |
| **TOTAL** | 4,990.00 |

Debtors testified that each family member has a cell phone in addition to home telephone service.  They also subscribe to an expanded cable television service and a separate high-speed internet service.  Debtors' food budget provides for their three family members, as well as their son's friends, who occasionally eat at their house.  No explanation was given concerning the home maintenance expenses, since Debtors rent their home.  Their transportation costs consist of fuel and maintenance for their two cars, and the only significant change in their budget since filing schedule J concerns their auto expenses.  Debtors' son

MEMORANDUM OF DECISION - 7

now drives and their auto insurance premium has increased from $200 to $380 a month. On the other hand, Debtors' auto loan payments have dropped from $1,155 to approximately $900 per month since they purchased the new Hyundai. *See* Ex. C at 17–22.

A different picture of Debtors' spending habits emerges upon examination of their checking account records. Ms. Amador indicated she no longer uses credit cards for her purchases and operates on a strict cash basis. Ex. C at 28. Thus, Debtors' checking account statements between October 2005 and February 2006, Attachments to Ex. 1, would seem to represent an accurate account of Debtors' spending habits.

Telling examples of Debtors' financial excesses are represented by the several recurring debit charges for the following goods and services identified on Debtors' monthly statements: XM Satellite radio; Dell catalog purchases; $240 per month to "Big Smoke;" $45 per month for "proactiv solution;" $14.95 for "Napster;" a $29.99 charge identified as "online games pogo;" as well as several other debits that are more cryptically or vaguely identified. Bank Statements, Ex. C. There are also recurring bank charges for insufficient funds. According to Ms. Amador, Debtors currently spend roughly $5,900 each month, consistently exceeding their net income by $200.

MEMORANDUM OF DECISION - 8

L.D. Fitzgerald, a long-standing chapter 13 trustee for the District of Idaho, testified on behalf of the UST as an expert witness. In his decades of experience, Mr. Fitzgerald has been called upon to review and evaluate thousands of consumer budgets to determine if proposed chapter 13 plan payments were in line with those debtors' monthly disposable income. His opinion in such matters is entitled to considerable weight in the Court's view.

To render his opinion, Mr. Fitzgerald examined Debtors' schedules, their checking account statements, and their pay records. In his opinion, based upon net income of $5,700 per month, Debtors could likely fund a chapter 13 plan that would pay their priority obligations in full. To make such payments, Mr. Fitzgerald would suggest that Debtors eliminate their cell phone service; reduce their food budget to $600; cut their transportation costs by $100, because they now presumably spend less on fuel with the new car (although their insurance has increased); eliminate their charitable contributions, which Ms. Amador testified are voluntary; and make a slight reduction in their cable television and internet plan. Mr. Fitzgerald assumed that Debtor's auto loan payments would be paid by the Chapter 13 trustee under the plan, eliminating that payment from the monthly budget figures. All things considered, according to Mr. Fitzgerald, Debtors could reduce their monthly expenses to $3,225 per month, thereby freeing up

MEMORANDUM OF DECISION - 9

approximately $2,400 per month to contribute to plan payments, while still allowing a monthly budget for recreation, home maintenance (which was never explained), and their current level of internet service. His projections of a reasonable budget include:

| Item | Debtors' Estimate | LDF's Chapter 13 Estimates |
|---|---|---|
| rent | 1,000.00 | 1,000.00 |
| utilities | 150.00 | 150.00 |
| water/sewer | 75.00 | 75.00 |
| phone | 60.00 | 60.00 |
| cable | 100.00 | 90.00 |
| cell phone | 150.00 | 0.00 |
| internet | 50.00 | 50.00 |
| home maint. | 200.00 | 200.00 |
| food | 1,000.00 | 600.00 |
| clothing | 100.00 | 100.00 |
| laundry | 50.00 | 50.00 |
| med/dental | 50.00 | 50.00 |
| transportation | 500.00 | 400.00 |
| recreation | 100.00 | 100.00 |
| charitable | 50.00 | 0.00 |
| insurance:auto | 200.00 | 375.00 |
| Auto Loans | 1,155.00 | 0.00 |
| TOTAL | 4,990.00 | 3,300.00 |
| monthly disposable income | 710.00 | 2,400.00 |
| 5 yr plan | 42,600.00 | 144,000.00 |
| 3yr plan | 25,560.00 | 86,400.00 |

When challenged with Debtors' bank statements that they suggest prove Debtors are unable to fund a Chapter 13 plan with a payment of $2,400 per month, Mr. Fitzgerald responded by noting that the bank records simply show what Debtors' actually spend, not what they reasonably need to spend each month.

MEMORANDUM OF DECISION - 10

**Disposition**

**A.    Applicable Law.**

>    Section 707(b) provides:
>
>    After notice and a hearing, the court, on its own
>    motion or on a motion by the United States trustee, . . .
>    may dismiss a case filed by an individual debtor under
>    this chapter whose debts are primarily consumer debts
>    if it finds that the granting of relief would be a
>    substantial abuse of the provisions of this chapter.
>    There shall be a presumption in favor of granting the
>    relief requested by the debtor.

11 U.S.C. § 707(b). Debtors are individuals, and they have not argued that their debts are other than "primarily consumer debts." Thus, the first two elements of § 707(b) are not at issue here.

The Code does not define "substantial abuse." To decide whether substantial abuse is shown, in the Ninth Circuit the primary factor the Court is instructed to consider is whether a debtor can pay his or her debts. *In re Lenartz*, 263 B.R. 331, 336 (Bankr. D. Idaho 2001). In *Zolg v. Kelly* (*In re Kelly*), 841 F.2d 908, 914–15 (9th Cir. 1988), the Ninth Circuit explained:

>    the debtor's ability to pay his debts when due, as
>    determined by his ability to fund a chapter 13 plan, is
>    the primary factor to be considered in determining
>    whether granting relief would be a substantial abuse. . .
>    [A] debtor's ability to pay his debts will, standing

MEMORANDUM OF DECISION - 11

> alone, justify a section 707(b) dismissal. . . This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown. But a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse.

*See also Price v. U.S. Trustee* (*In re Price*), 353 F.3d 1135, 1139 (9th Cir. 2004) (reaffirming the holding in *Kelly* and the lower court's finding of substantial abuse when the debtor had the ability to pay his debts); *Gomes v. U.S. Trustee* (*In re Gomes*), 220 B.R. 84, 87 (9th Cir. BAP 1998) (applying *Kelly* and explaining that there is no threshold percentage for determining what constitutes the "ability" to pay one's debts). When the moving party is the U.S. Trustee, the § 707(b) presumption in favor of granting a debtor relief under chapter 7 may be rebutted by objective evidence regarding the reasonableness of a debtor's expenses sufficient to support a finding of the ability to repay. *Voelkel v. Naylor* (*In re Voelkel*), 322 B.R. 138, 146 (9th Cir. BAP 2005) (citing *Kelly*, 841 F.2d at 915; *In re Harris*, 279 B.R. 254, 261 (9th Cir. BAP 2002)).[7]

**B.  Analysis.**

Based upon the evidence, including Debtors' schedules and

---

[7] The Panel in *Voelkel* explained that when the moving party is the UST, objective evidence regarding the reasonableness of a debtor's expenses is required, but when the moving party is the Court exercising its powers under § 707(b), it may rely upon its own value judgments to determine the reasonableness of a debtor's expenses. *In re Voelkel*, 322 B.R. at 146.

MEMORANDUM OF DECISION - 12

testimony, together with the opinions expressed by Mr. Fitzgerald, it seems clear that if they undertook a chapter 13 plan, Debtors could pay a significant amount of their unsecured debt. The budget suggested by Mr. Fitzgerald was quite generous based upon the Court's experience. Many chapter 13 debtors are currently striving to complete a plan on much less.

The $5,700 Debtors receive each month in net income allows them to continue voluntary contributions to their pension plans, even though such contributions have previously been held to be unnecessary for the maintenance and support of the debtor in a chapter 13 case. *In re Estes*, 254 B.R. 261, 263 (Bankr. D. Idaho 2000). Mr. Fitzgerald also accounted for the increase in auto insurance premiums, when this Court, applying its own judgment, might suggest that Debtors' son contribute financially to the cost of his driving. And under Mr. Fitzgerald's calculations, Debtors would still enjoy both a monthly recreational budget and premium cable television service with access to high-speed internet, though neither were likely justified under these facts.

The largest deduction made by the expert as compared to Debtors' budget concerns their food expenditures. Debtors indicated that they spend $1,000 per month, which feeds the family as well as their son's friends who occasionally stop by to visit. The suggestion that Debtors reduce their food

MEMORANDUM OF DECISION - 13

budget to feed their family of three for $600 seems reasonable. While their hospitality is commendable, given their debt, Debtors can not expect to routinely feed others who are not dependent upon them. *See In re Lenartz*, 263 B.R. at 338 (considering $500 per month in food expenses for a family of three reasonable in 2001).[8]

The Court also agrees that Debtors could significantly reduce, and perhaps completely eliminate, their monthly cellular phone bill. While a common convenience, this service is not essential under these facts. Both Debtors work full-time at a single location during the day, and can be reached at work without the need for a mobile phone. They also have home telephone service. While it may be desirable under ideal circumstances, Debtors' son does not require a cell phone to maintain appropriate contact with his parents. *See In re Lenartz*, 263 B.R. at 338 (considering luxury items "nonessential goods" that could be eliminated or sold).

---

[8] While the 2005 amendments to the Bankruptcy Code do not apply to this case, the Court notes that the currently applicable IRS National Standards for Allowable Living Expenses allocate $754 per month in food purchases for a family of three earning over $5,834 in gross monthly income. While this figure is $154 higher than Mr. Fitzgerald's budgeted amount, the Court also observes that the IRS Standards would only allow $86 dollars for housekeeping supplies, while Debtors' hypothetical chapter 13 budget allows for $200 in "home maintenance" for their rented dwelling. *See* IRS National Standards for Allowable Living Expenses (2006), available at http://www.usdoj.gov/ust/eo/bapcpa/bci_data/national_expense_standards.htm.

MEMORANDUM OF DECISION - 14

Under a hypothetical chapter 13 scenario, if Debtors were to reduce their monthly expenditures by the amounts suggested and move their auto loans into a plan payment,[9] they would have the necessary $2,400 per month in disposable income to pay $86,400 in plan payments over three years, or $144,000 over five years. Assuming the applicable chapter 13 trustee's commission would be as high as 10% of the payment, *see* 28 U.S.C. § 586(e)(1)(B)(i)), and $2,000 would be paid to Debtors' attorney, *see* LBR 2016.1 (2005) and Gen. Ord. 203 (prescribing a $2,000 presumptively reasonable fee for cases filed before January 1, 2006), Debtors could still expect to pay their priority unsecured debts in full along with car payments, under a plan.[10] This repayment amount is significant, and demonstrates that Debtors do have the ability to repay their debts under a chapter 13 plan.

In the Court's opinion, Debtors' use of chapter 7 under these

---

[9] Even if Debtors did not restructure their auto creditors' claims, monthly payments could be made via the trustee. *See* Model Ch. 13 Plan, available at http://www.id.uscourts.gov/docs/13Plan05.pdf

[10] Under the hypothetical five year plan, Debtors would contribute a total of $144,000. Subtracting $14,400 for the trustee, $2,000 for their attorney, and $54,000 in total car payments leaves them with $73,600, only $400 shy of the $74,000 owed to their priority unsecured creditors. Since the Court was more than generous in assuming Debtors would receive no bonuses or overtime wages, and would allow them to make unnecessary voluntary contributions from their gross wages, the $400 shortfall is insignificant. The Court therefore presumes Debtors would be able to retire their priority unsecured debt, which represents over 50% of their total unsecured consumer debt. Their remaining unsecured creditors would likely receive a $0 dividend.

MEMORANDUM OF DECISION - 15

circumstances amounts to substantial abuse for purposes of § 707(b).

## Conclusion

The evidence, testimony, and schedules indicate Debtors have the ability to repay a significant portion of their debt, including 100% of their priority unsecured debt, over the life of a five year plan. Debtors will be afforded an opportunity to convert their case to one under chapter 13 so they may propose a debt repayment plan. If they fail to do so, the case will be dismissed. A separate order will be entered.[11]

Dated: June 1, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

---

[11] In its brief, the UST also suggested that facts may be present in this case justifying dismissal of Debtors' case for "bad faith" filing. Because those facts would not necessarily justify dismissal if Debtors convert this case to one under Chapter 13, the Court declines to address the UST's bad faith argument in this context.

MEMORANDUM OF DECISION - 16